Okay. Case number 18-20493, Geophysical Service v. TGS. We'll hear from Mr. Rothman first. Morning, Your Honors, and may it please the Court, my name is Joel Rothman, and I represent Geophysical Service, Inc., the appellant in this case. Geophysical Service, Inc. is also represented here in the courtroom by Paul Einerson, the CEO of the company. Your Honors, as this Court has observed previously, copyright is a right against the world. It is a right that comes from statute authorized by the Constitution. It is different from contract in that regard. It's a right exclusive to the owner to, in this case, under 602A, prevent importation. And as the Court below correctly held on remand from this Court's last decision in this case, it is a right that is judged by U.S. legal standards under the Copyright Act. And that decision is not challenged here. Here, we have an issue related to contract. The district court erred by treating copyright as a contract instead of a right against the world. The Copyright Act says that there is no license unless the defense prevails in its affirmative defense, that the plaintiff is presumed not to have granted a license when the plaintiff sues, that the defendant has the burden of proof on license. This applies to both express and implied license. And as a result, the defendant here, TGS, had the burden on each and every element of license. As to express license, there is no license expressly in the record. At tab 9 of the appendix is the permit that TGS asserts is an express license, a permit granted to my client to do exploration, a permit that TGS is mentioned nowhere in. There is no grant of license here. There is no privity with TGS. There are no express terms. There is only this footnote referencing another document. There is no language incorporating that other document by reference. There is no basis to read the offshore exploration document, which is at tab 10 of the appendix. There is no basis to read anything in this document as creating a license either. The contract language that TGS points to, that the requirements and services of the Federal agencies concerned are outlined in the publication offshore exploration, that's the language from the two asterisks in the permit that is in the appendix at 9. Well, what does offshore exploration say about the requirements and services about the Federal agencies concerned? Well, what it says are, what it says is that there are numerous Federal agencies concerned that have numerous requirements. They are not limited, as the district court said in page 10 to 11 of the district court's decision. In fact, they are almost unlimited. The Federal agencies concerned include the Department of Resource Management, the Department of Transportation, including the Canadian Coast Guard, the Department of Environment, of Fisheries, of Defense, of Indian Affairs, of Industry, Trade, and Commerce, as well as other agencies, including the Canadian National Revenue, Communications, Immigration, and other subsidiaries of other departments mentioned in this document. This footnote referred to that supposedly creates a license, when read in context and limited in scope, refers to where to send notices about the work that my client was discussed in its prior decision involved taking a boat and going back and forth across the ocean, in this case the Atlantic Ocean with streamers, projecting sound down below the surface of the earth in order to create seismic maps. Of course, if you're doing that kind of work, it would make sense that you give notice to, for example, the Department of Fisheries, because the boats are going back and forth and they're pulling along, trolling basically along, long lines that might interfere with fishing. That makes sense. As do all the other notices that this refers to, but not a license. Also, the notice concerns field work. This is not field work. And where it is placed, if read properly in context, shows its meaning. It doesn't incorporate any contract terms. It doesn't signal that there are going to be certain requirements that are going to be agreed to. And again, it isn't with TGS. It refers to a booklet that is more than a booklet. It's a book. It's over 200 pages of informational material that just happens to include a reference on page 62 to the fact that if someone wants a copy of prior seismic that is available and released, unlike what my client was doing, which is creating speculative seismic, which is undisputedly for purposes of licensing that is expensive to create and therefore it requires economically years of licensing in order to recoup the expense. Was the seismic data that your client produced copyrighted? In fact, Your Honor, the decision of Judge Eidsvig, which is in the record, discussed copyright protection for seismic. It is the first decision of any court in the world, to our knowledge. And Judge Eidsvig, in that decision that was attached to our opposition to summary judgment, concludes after exhaustively examining both the law of copyright worldwide under the Berne Convention and the particular attributes of seismic, concludes that seismic lines and sections are copyrightable and protected by copyright under the Canadian Copyright Act, and since our country and Canada both accede to the Berne Convention, one would expect that a court in this case, when looking at the evidence, would similarly conclude. Now — What's the answer to the question? Well, if your answer — if Your Honor is asking whether they were registered as opposed to whether they're copyrightable, the answer to that is that application was made to register the works, and the Copyright Office refused registration. So under Section 411a, we can still file. There's also a question about whether or not these are U.S. works, because 411a of course requires registration for U.S. works, not foreign works. And we've alleged that, in fact, these were foreign works because they were created abroad. So it wasn't copyrighted or registered? The registration was applied for and refused. It wasn't achieved. It was not achieved, but that is not an impediment to suit under 411a. And the Fourth Estate case that came down from the Supreme Court does recognize that fact, and the statute does allow those cases to proceed regardless of the registration status of the work. And what relief were you looking for in the district court? What are you looking for? We're looking for damages, Your Honor, because — How many damages? The damages that we've alleged are in excess of a million dollars based upon the value of the license that would have been granted to the defendant had they requested one for this material that instead they copied without license and imported into the U.S. In addition, we would be entitled to other damages, but we haven't even gotten to the damages portion of this case. How does it claim it? How do you quantify those damages? Well, my client has standard licensing fees that it charges based upon the amount of seismic material as measured in kilometers, and so we would be able to show a trial that the works imported were of a certain amount that we would have licensed these for X amount based on the amount of kilometers imported. Just one job? We're talking right now about a single set of seismic from a single extensive survey, and it's huge because it covers thousands of square kilometers. And so — but yes, this is expensive to license because this is a licensing model that is — that my client follows, and other companies, TGS included, who is a competitor of ours, follows this model. It costs a lot to produce this material, and in order to recoup that investment, it can be licensed over many, many years in order so that the company can earn a profit from this exploratory work. The implied license, too, has no basis, and there is no evidence other than the essentially dixie-dixit of a gentleman who 30 years ago worked at the same institution that existed under a prior regime, and from the standpoint of summary judgment, there are hotly contested and disputed facts here that the district court completely ignored. The — it's also worth mentioning, I think, that the decision was rendered very quickly. We basically had an argument and then had a decision, you know, within one business day later. And we never had an opportunity in the district court, and the district court completely overlooked all of the evidence. What's that? It was briefed before the argument. It was briefed, Your Honor. Absolutely. Would it penalize a district judge for having read the briefs? Absolutely not. And done research and come to conclusions based upon those prior to the hearing? Absolutely not. Absolutely not. I am not suggesting that, Your Honor, at all. I am not at all suggesting that. The — but the issues as they are, I think, are well briefed before this Court. The yellow light is on. May I add the minute left to my rebuttal time, please? It doesn't work that way, but you don't have to use the minute. Okay. Thank you. All right. Ms. Rother? Rother? Rother, Your Honor. Rother. Thank you. No, that's fine. Silent H? Silent H, yes. May it please the Court. I'm Melanie Rother, and I'm here today representing TGS, NOPEG, the appellee in this case. The central issue on appeal in this case is whether GEOPhysical should have known in 1982 and in 1983, when it submitted seismic data to the Canadian government, that that data could be copied and distributed. And the issue can be resolved from the plain language of the permit. Which did it have? If — Did it have permission to submit that? If — yes. This is its authority to be able to shoot seismic data offshore in government — in Canadian government waters. And it's required by the Canadian regulatory regime to get this permit. And the plain text of this permit, along with the publication offshore exploration, can resolve this issue for the Court. There is no dispute that the offshore program notice, GEOPhysical's permit in this case, clearly references offshore exploration. And there cannot be a dispute that offshore exploration clearly provides information that says that third parties can obtain copies of that data once the statutory confidentiality period has been — has expired. So whether this Court considers this under an express license theory or an implied license theory, the result is still the same. GEOPhysical conveyed permission to — the right to copy and distribute the data at the end of the confidentiality period. The district court found for — found for TGS on summary judgment on both the express and the implied license theory. The record conclusively shows that the offshore program notice has clear reference to offshore exploration and contains incorporating language. That language is, the requirements and services of the federal agency's concern are outlined in offshore exploration. The reference is clear. The reference is clear to offshore exploration. And as Judge Rosenthal properly found under this Court's precedent in one beacon, that the elements are met. There is a clear reference to offshore exploration. GEOPhysical was clearly on notice to go look at offshore exploration. There's — there's no doubt they were on reasonable notice that that document existed. And they manifested assent to that document when they handed in the permit to the government seeking authorization. And the district court applied that test and found that offshore exploration and its requirement to allow third parties to obtain copies of that data at the end of the exploration period was incorporated into the offshore program notice. And I would point out that the district court did not have before it arguments related to incorporation by reference. GEOPhysical did not argue incorporation by reference at the district court. But regardless, on the merits, this language that's in the offshore program notice is very similar to this Court's holding in El Rashad. In El Rashad, the incorporation language was terms and conditions are based on. Here our language is requirements and services are outlined in. There is no suggestion whatsoever that this footnote to the text of the permit is narrowed and limited to the notification provision. There's absolutely no sound reading that way. GEOPhysical argues that it should be limited to notification, but a reasonable reading of the footnote does not suggest that. A reasonable, if you try to read the limitation of notification into the incorporating reference here, then you have to read out words. You have to read out the words and services. Because you can't have a notice requirement and a services notice, which is what would be required if this was limited solely to notice. And also, it requires the adding of the word other. Because in the notice provision, it's narrowly tailored to the other federal agencies concerned. And that's because the program notice itself gives notice to the resource management branch, which is the branch that actually governs the submission and release of data. So in order to make it consistent, that language would have to read to the other federal agencies concerned, and it does not. Therefore, we submit that the district court correctly found that offshore exploration was incorporated into the offshore program notice, and that created an express license to copy and distribute the data at the end of the confidentiality period. Why is there a confidentiality phase? The confidentiality period, Your Honor, is part of the regulatory regime. It's part of the idea of being able to balance the needs of these companies that are shooting seismic data to allow them the time to recoup the investment, as opposing counsel was discussing. But at the same time, it allowed for the government's stated policy of wanting to increase and enhance offshore exploration. There's a 1976 white paper where the government outlined this initiative. They outlined a national energy strategy where they said we have a need to know. We need to know what our offshore resources are in our other federal lands. And because of that, we need to get this data out to industry so that we can understand our resources and understand if we have self-reliance. So this was all part of the government's purpose in enacting these regulations to begin with. Turning now to implied license, the record evidence conclusively establishes that the totality of the circumstances and the totality of the party's conduct created an applied license to copy and distribute. There is significant evidence in the record about the government's intent to copy and distribute this data at the expiration of the confidentiality period. And I submit to this court that there is absolutely no evidence in the record to suggest that it wasn't. Mr. Rothman spoke about speculative seismic data and how that's treated differently. There's absolutely no evidence in this record that in 1982 and 1983, the relevant time period, that seismic data was being treated any differently. And in fact, Mr. Harrison testified that there is no distinction in the laws. There is no distinction in the regulations between exclusive and speculative data. It was not treated differently to his knowledge. And in fact, we know it wasn't treated differently because in the January 1983 report that the Canadian government sent out, it had 698 geological programs and geophysical programs that had been released at that time that were available for copying. And 14 of those were geophysical speculative data. So we know for a fact they were copying and releasing the data. As mentioned, geophysical has tried to avoid this result by claiming that speculative data is treated differently, but it's simply not, and there's absolutely no evidence. Geophysical submitted as evidence in this case four affidavits. Those affidavits were recycled from a case in Canada on different issues and applying different law. And in each of those four affidavits, there is absolutely no evidence, and they have not pointed to any evidence in their brief to suggest that seismic data was treated differently in 1982 and 1983. Mr. Paul Einerson's affidavit does not discuss anything before 1993 and 1994, so it sheds zero light on the issue. Mr. Gill, an expert, was working in Texas for ARCO in the Permian Basin from 1979 to 1989 and offers no information about what was happening in Canada in 1982 and 1983. And the other two, Mr. David Einerson talked generally about the changing regulations but offers no information whatsoever about what the government was doing in 1982 and 1983. And Mr. Harper's expert report simply talks about governments around the world and their requirements that data be submitted and how that impacts speculative data, but it does not go at all to what the Canadian government was doing in 1982 and 1983. Finally, Geophysical has suggested that somehow the importation of this data into the U.S. would not have been granted through a license, and that is simply not correct. There is absolutely no evidence in the record that the Canadian government was not copying and distributing this data outside of Canada. In fact, Mr. Harrison testified that that would undercut the entire policy of the regulatory regime. In that time frame in 1982 and in 1983, the Canadian offshore exploration was dominated by multinational companies. And the whole idea was to get this information and this data to companies so they would come and explore offshore Canada. So there is nothing in the laws, nothing in the regulations that prevents the Canadian government from sending this seismic data once the confidentiality period has ended to the United States. So to conclude, Your Honor, the conclusive evidence establishes that Geophysical knew or should have known that the Canadian government could and would copy and distribute the data once the confidentiality period ended. Indeed, Geophysical continued under this court's holding in cases like Bayes' Den and the Eleventh Circuit's holding in Latimer. They continued to submit the data after there was a report that said their speculative data was available for copy and release. So whether it's an express license through incorporation by reference or implied license through the totality of the circumstances, Geophysical submitted this data to the Canadian government with the knowledge or at least should have known, because it's an objective intent standard, they should have known that the government was going to copy and release that and they conveyed a license to do that. Thank you. Mr. Ruffin, your rebuttal. Thank you. This is not a case, Your Honors, about confidentiality. This is a copyright infringement case. Confidentiality is not relevant. What is relevant to copyright infringement? Copying. Distribution. There is disputed evidence throughout this record regarding what Geophysical knew and what it knew when. The affidavits of Mr. Einerson in the record of 2817, of Mr. Gill at 2835, and Mr. Harper at 2870, they all dispute what my friend argued, which is that speculative seismic was understood to be different. In fact, Mr. Harrison, my friend's client's expert, testified that speculative seismic was dealt with in a discretionary manner with regard to whether it was released. But even if the issue of whether it could be released is relevant, which we dispute, because it, again, isn't about confidentiality. It's about, are you entitled to go to the library and copy wholesale huge volumes of data and information and then ship those to the U.S. at the request of a Houston company? That is copyright. That isn't the question of confidentiality. You can take out the book and take it on the plane and go to the U.S. and benefit from it? Well, the information, according to the regulations, was kept in a special room at these different petroleum boards, and you could go — They clearly checked out, if you will. I mean, they clearly got a copy. They didn't sneak in the middle of the night and steal a copy. True. They got a copy of the board. What they did was they asked the board to send it to a copy shop down the street, and the copy shop copied it, shipped it to Houston, and then gave the original back to the board. And — But the board knew that. The board knew it. And, in fact, the evidence has been that the board warned recipients that they might be violating intellectual property laws when they did this. And so we have a situation Was that a warning? What? The warning you're talking about, where was it? There are forms that they require many recipients of this information to — Where is that in the record? Where is it in the record? I would have to provide Your Honors with a cite to that after this. It was something that I believe was submitted in opposition. But regardless, Mr. Harrison admitted that there was discretion to withhold this same information and not provide it. And the argument then that, you know, my client knew, that my client objectively should have understood, that argument is disputed by their own expert, who recognized that we had, as our other affidavits indicated, a right to expect that this information would be respected and not released for copying. Even the Canadian court, looking at the issue of whether or not a license, express or implied, was granted, said that it was not. In our brief, open brief at 42, the Court looked at the issue of whether speculative data was maintained as confidential, and the Court found that, in fact, there had been a policy where it was maintained in perpetuity in some cases. The Court looked at this issue of implied license in Canada and rejected it on the facts.